UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**
SEP 1 5 2009
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES OF AMERICA )
)
v. ) Cr. No. 00-0157-15 (TFH)
)
LARRY WILKERSON, )
)
Defendant. )
)

## MEMORANDUM OPINION

Pending before the Court is defendant Larry Wilkerson's Motion for a New Trial Based on Juror Misconduct ("Juror Misconduct Motion") (Docket No. 2405). In September 2004, after a two-month trial, a jury found defendant Larry Wilkerson guilty of nine counts related to narcotics conspiracy, RICO conspiracy, and the murders of Marvin Goodman, Christopher Burton, and Scott Downing.[1] Wilkerson filed numerous post-trial motions attacking the validity of the proceeding, of which the Juror Misconduct Motion is one. Because of these pending motions, Wilkerson has yet to be sentenced.

Since Wilkerson's trial concluded, the Court has received two letters from a juror who sat in the case. In these letters, Juror 0552 (also known as Juror 9),[2] alleges various improprieties by her co-jurors. To explore these allegations, the Court held a hearing on July 1, 2009, at which it

---

[1] The jury found Wilkerson not guilty of two counts related to the murder of a fourth person, Darrell Henson.

[2] The 0552 designation represents the juror's number from the venire. Within the empaneled jury, this juror's number was 9. This juror sat for the entire trial, but the Court dismissed her on the fifth day of the jury's deliberations based on her representations that she strongly disagreed with the law governing the case and would not follow it.

1

questioned Juror 0552 directly based upon questions submitted by both parties before and during the hearing.³ Following that hearing, Wilkerson filed the Juror Misconduct Motion seeking a new trial, or, in the alternative, a further hearing at which other jurors would be summoned to confirm the veracity of Juror 0552's allegations. After careful review of the record and the controlling law, the Court will deny the motion.

## BACKGROUND

On March 17, 2005, the Court received an undated letter alleging that misconduct took place during jury deliberations:

Dear Judge Hogan,

I was juror number 9 on the trial of United States vs. Larry Wilkerson. As I saw an article in the paper about his co-defendants who were sentenced, it urged me to write you this letter. I was really disturbed in regards to the trial I sat on because of the misconduct that took place during deliberation. It bothered me so much to the point that I wrote you the letter asking to be dismissed. The law states that a person has a right to a fair trial and Mr. Wilkerson, I believe did not. I'm sure that the deliberation should be just as fair as the trial. I know it will soon be time for Mr. Wilkerson to be sentenced and before that happens I would like to address these concerns to you in more detail if possible.

Sincerely,

Juror Number 9

*See* Docket No. 2288 (copy of letter). In June 2005, Wilkerson filed a motion for a hearing to investigate the alleged jury misconduct. At status hearings in September 2006 and January 2007, the Court discussed with counsel how to proceed in light of this letter, but never took action on it. In June 2008, Wilkerson renewed his motion for a hearing.

---

³ The Court adopted this procedure from *United States v. Edelin*, 283 F. Supp. 2d 8 (D.D.C. 2003), where the trial judge faced a similar situation.

2

On September 11, 2008—with Wilkerson still seeking a hearing to investigate the allegations, and sentencing yet to occur—the Court received a second letter, dated September 8, 2008:

Dear Judge Hogan,

I have constructed a second letter to address my concerns in regards to the case against Larry C. Wilkerson. It has been roughly three years since I last contacted you in regards to his case. It is quite disheartening to know that Mr. Wilkerson is still awaiting his fate. The judicial system has failed him and me as citizens of this country. Since I was unable to address my concerns in person, I will address my concerns throughout this letter.

My first concern, lies within the trial itself. The trial was solely based on hear say [sic] and throughout the trial, I heard more about Kevin Gray than I did about Mr. Wilkerson. The second concern was that of the other jurors. One juror had a personal vendetta, due to a relative being killed by a "drug dealer" and this was expressed by the juror herself. Others did not make their decisions based off facts but waited for the other jurors to make a decision before they decided. Another juror made a comment, "that she wanted to convict Mr. Wilkerson of all charges whether the evidence pointed to his guilt or not". Some jurors did not know who to believe because of the many cooperators in this case that seemed to be cooperating for their own benefit. Lastly, one juror claimed to have possibly sat on one of his previous cases that were held at the Supreme Court.

Please tell me how this constitutes as [sic] justice? Mr. Wilkerson did not have a fair trial and certainly did not have a fair deliberation. It is definitely unfair for Mr. Wilkerson to be sitting in limbo for four years not knowing when this situation will come to a close. Even though he was convicted of a crime, he is still a human being. I cannot express enough my disappointment in our court system. I sincerely hope that I do not have to rely on this system in my lifetime. Hopefully, justice will be served and a different perspective can be presented about the system. I am more than willing to appear in court in the presence of you, the prosecutors, and the defendant and his counsel if necessary. I sincerely hope you can find it in your heart to evaluate this case from all angles.

Sincerely,

Juror 0552

See Docket No. 2373 (copy of letter).

As a preliminary matter, the Court accepts that both of these letters are genuinely from the individual juror known both as Juror 0552 and Juror 9. *See* Hearing Tr. (July 1, 2009) at 13, 17 (juror confirming that she wrote both letters).

## ANALYSIS

The questioning at the July 1, 2009 hearing and Wilkerson's Juror Misconduct Motion focus only on those allegations in the September 2008 letter that go to improper bias: that (1) a juror expressed that she had a "personal vendetta" due to a relative being killed by a drug dealer; (2) a juror had predetermined to convict Wilkerson regardless of the evidence; and (3) a juror may previously have sat on another trial of Wilkerson. As to the second and third of these allegations, Juror 0552 clarified during the hearing that they both related to a single juror; that is, one juror had allegedly both predetermined to convict Wilkerson and possibly sat on a previous trial of his. Hearing Tr. at 33.

Wilkerson argues that Juror 0552's uncontradicted testimony proves juror bias prejudicial to Wilkerson, requiring that his convictions be vacated and a new trial ordered to vindicate his Sixth Amendment right to an impartial jury and Fifth Amendment right to due process. In the alternative, Wilkerson argues that he is entitled to a further hearing at which the Court would question the allegedly biased jurors[4] directly to confirm Juror 0552's allegations and assess whether those jurors were dishonest during *voir dire* at the time of jury selection. Should such a

---

[4] Due to the particularities of Wilkerson's trial, it is not clear exactly which jurors are the subject of Juror 0552's allegations; rather, an educated guess is the best that the Court and the parties can do. Because of security concerns, the jurors' identities were kept confidential even from each other. Juror 0552 therefore has no way to identify the jurors in question other than by providing descriptive details as best she can, which she did at the July 1, 2009 hearing. Based on that testimony, Wilkerson has come up with five possible candidates for the two jurors that Juror 0552 means to implicate.

4

hearing take place, Wilkerson contends that a presumption should attach that he has been prejudiced by the jurors' alleged bias and dishonesty, with the burden on the government to demonstrate that any bias was harmless.

The Court rejects Wilkerson's arguments on multiple grounds. First, the Court finds that Juror 0552 lacks credibility and thus does not accept her allegations. Second, as a supplemental ground to the incredibility of Juror 0552's allegations, the Court finds in its discretion that a further hearing would unduly impose upon the jurors who would be called to testify. Lastly, the Court finds that the claim that a juror may *possibly* have sat on a prior trial of Wilkerson can be dismissed on its face as an insufficiently definite allegation. After a review of the relevant law, these three grounds are explained more fully below.

## I.   Legal Standards

"The Supreme Court has stressed repeatedly that the touchstone of the guarantee of an impartial jury is a protection against juror bias." *United States v. Boney*, 977 F.2d 624, 633 (D.C. Cir. 1992) (citing *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984)). Generally, the remedy for alleged jury misconduct or bias is a hearing to determine if prejudice occurred. *See Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."); *United States v. Williams-Davis*, 90 F.3d 490, 496-97 (D.C. Cir. 1996); *but see Boney*, 977 F.2d at 634 ("We do not now hold that any false statement or deliberate concealment by a juror necessitates an evidentiary hearing.").

Notwithstanding the need to protect against juror bias, post-verdict scrutiny of juror conduct is disfavored due to the risk of undermining "full and frank discussion in the jury room,

5

jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople." *Tanner v. United States*, 483 U.S. 107, 120-21 (1987). "Ordinarily, a verdict will not be upset on the basis of a juror's post-trial report of what occurred in the course of deliberations." *United States v. Campbell*, 684 F.2d 141, 151 (D.C. Cir. 1982). "The single exception concerns 'extraneous influences' that may have improperly influenced the verdict." *Id.* Such extraneous influences must be distinguished from intra-jury influences:

> "Extraneous influence" has been construed to cover publicity received and discussed in the jury room, consideration by the jury of evidence not admitted in court, and communications or other contact between jurors and third persons, including contacts with the trial judge outside the presence of defendant and his counsel. By contrast, evidence of discussions among jurors, intimidation or harassment of one juror by another, and other intra-jury influences on the verdict is within the rule, rather than the exception, and is not competent to impeach a verdict.

*United States v. Wilson*, 534 F.2d 375, 378-79 (D.C. Cir. 1976).

The strictures of FED. R. EVID. 606(b) confine any inquiry into alleged jury misconduct. That rule states, in relevant part:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

FED. R. EVID. 606(b). "The exception for improper outside influence allows testimony about the fact and nature of the contact (the input, as it were), but not about the effect it produced on the juror's state of mind." *Williams-Davis*, 90 F.3d at 496.

A "trial court has wide latitude in determining the method of inquiry into possible

prejudice." *Leisher v. Conrad*, 41 F.3d 753, 756 (D.C. Cir. 1994). The inquiry "need not be conducted as a full evidentiary hearing"; rather, it "need only be sufficiently detailed to permit the judge to determine whether any prejudice is likely to result." *United States v. Butler*, 822 F.2d 1191, 1196 (D.C. Cir. 1987). In designing the inquiry, "[t]he prevention of 'juror harassment' through extensive questioning and cross-examination is a legitimate reason to curtail a hearing or not to call jurors in for questioning." *United States v. Edelin*, 283 F. Supp. 2d 8, 13 (D.D.C. 2003) (citing *Williams-Davis*, 90 F.3d at 499; *United States v. Williams*, 822 F.2d 1174, 1189 (D.C. Cir. 1987)). When jurors are called in for questioning, "a Court has discretion to assess the credibility of jurors' testimony." *Edelin*, 283 F. Supp. 2d at 15 (citing *United States v. Bertoli*, 40 F.3d 1384, 1395 (3d Cir. 1994); *Smith v. Phillips*, 455 U.S. at 217 n.7)). Ultimately, "where the court conducts an inquiry broad enough to lead it to a reasonable judgment that there has been no prejudice, on an assumption as to the facts favorable to defendants' claim, it has fulfilled its procedural as well as its substantive duty." *Williams-Davis*, 90 F.3d at 499.

The D.C. Circuit reviews the procedures a district court employs to investigate juror misconduct for abuse of discretion. *Id.* at 497. "The more 'speculative or unsubstantiated' the allegation of misconduct, the less the burden to investigate." *Edelin*, 283 F. Supp. 2d at 14 (citing *Bertoli*, 40 F.3d at 1395). Likewise, a district court's "rulings on a motion for a mistrial [for juror bias] will be overturned only for an abuse of discretion." *Williams*, 822 F.2d at 1188. Finally, a trial court's "factual determinations regarding alleged misconduct are 'entitled to great weight, and [in the absence of new facts] ought not to be disturbed unless . . . manifestly unreasonable.'" *United States v. White*, 116 F.3d 903, 929-30 (D.C. Cir. 1997) (per curiam) (quoting *Hobson v. Wilson*, 737 F.2d 1, 49 (D.C. Cir. 1984)).

## II.     Juror 0552 Lacks Credibility

In its long experience on the bench, the Court has never before encountered a story like that of Juror 0552. Simply put, the juror has fallen for the defendant. It is unclear whether their relationship is a friendship, a romance, or something in between, but it is abundantly clear that the relationship is personal, meaningful, and lasting. In discussing this relationship, the Court makes no value judgment about it and in no way intends to demean it. To adjudicate Wilkerson's motion, however, the relationship must be recognized for what it is: Juror 0552 is fixated on Wilkerson. In the Court's judgment, this fixation—objectively demonstrated by the juror's behavior as described below—saps her allegations of credibility.

### A.      The Nature of the Relationship Between Juror 0552 and Wilkerson

The close relationship between Wilkerson and Juror 0552 is readily apparent from her own testimony at the July 1, 2009 hearing. She testified that, on her own initiative, she first visited Wilkerson at the D.C. Jail in October of 2004, shortly after the trial ended. Hearing Tr. at 19. Not having known Wilkerson or any of his friends or relatives prior to her jury service, *id.* at 18, this visit was her first personal contact with him. *Id.* at 19. It is instructive at this point to recall that the Court dismissed Juror 0552 in the midst of deliberations after she sent out a note stating that she strongly disagreed with the law as instructed and could not follow it. *See supra* n.2; *United States v. Wilkerson*, __ F. Supp. 2d __, 2009 WL 2001326, at *1-2 (D.D.C. July 10, 2009). In that note and under subsequent questioning by the Court, Juror 0552 also expressed that she was experiencing "emotional and mental distress" stemming from "the whole case." *Id.*

Juror 0552 testified that after the first visit in October 2004, she next visited Wilkerson at the jail in November or December, Hearing Tr. at 21, and on a monthly basis thereafter. *Id.* at

22, 24. Prior to the July 1, 2009 hearing, her most recent visit had been in March of 2009. *Id.* at 24. Extrapolating from Juror 0552's testimony, she has visited Wilkerson at the jail roughly fifty times since the trial.

These visits would be no small undertaking. Juror 0552 testified that she has resided in Columbia, MD for nearly five years, *id.* at 10, a commute of about thirty miles to the DC jail. Moreover, she testified that she is now employed, in the same job she had when she was put on the jury. *Id.* at 17. Finally, the Court considers it a matter of judicial notice that visiting an inmate at the jail typically involves significant time spent clearing security checks and waiting for a turn. For a working person to have fifty times commuted that distance and spent those hours shows a real commitment to the inmate being visited.

In addition to the visits, Juror 0552 also spoke frequently with Wilkerson on the phone. She testified that in the first few months after leaving the jury, but before writing her March 2005 letter, she spoke with Wilkerson on the telephone "a few times." *Id.* at 22. Later in the hearing, Juror 0552 testified that, as with the visits, her phone calls with Wilkerson became a regular event, "[m]aybe on a weekly basis." *Id.* at 24-25. Since March of 2009, she had perhaps one phone call with him. *Id.* at 27. Extrapolating again from this testimony, Juror 0552 has spoken with Wilkerson on the telephone some 200 times since the trial.

Beyond the visits and calls, Juror 0552 also testified that she and Wilkerson have exchanged "[m]aybe a few" letters, but "[n]ot many." *Id.* at 25. She did not keep copies of any letters he wrote to her, however. *Id.*

In addition to these numerous contacts with Wilkerson himself, Juror 0552 also mentored Wilkerson's daughter, who she testified is now about 17 years old. *Id.* at 25. Juror 0552 testified

that she and the daughter "[j]ust talked" and that "[i]t was pretty much on a mentoring basis." *Id.* at 26. Apparently, Juror 0552 took it upon herself to help out after Wilkerson told her about his daughter's situation: "It was something that he just let me know, and part of my sorority we do mentoring, so I just had, you know, a couple of conversations with her to try to keep her on track as far as graduating from high school and things of that nature." *Id.* Juror 0552 elaborated that "he told me a couple of things about her, her lifestyle, and that was something that I suggested that I could probably help her but just talking to her." *Id.* at 45.

Finally, the Court finds that Juror 0552 has put money into Wilkerson's prison account. When questioned whether she had made such deposits, she gave hesitant answers—not fully reflected in the transcript but very clear in the Court's memory. As transcribed, her testimony on this point arguably gives no conclusive answer:

> THE COURT: Have you been able to bring him any presents, or gifts or anything to prison? Were you able to put money in his prison account?
>
> THE WITNESS: Yes, no. You are not allowed to bring anything.
>
> THE COURT: Were you allowed to deposit money in his prison account to buy cigarettes or anything like that?
>
> THE WITNESS: I believe so.

*Id.* at 45-46. The Court interprets the meaning of this testimony as (1) "yes," she had put money in his account; (2) "no," she did not bring him gifts because visitors are not allowed to bring things into the prison; and (3) but she was allowed to deposit money in his prison account. Admittedly, the cold transcript could be read to confirm only the second and third points, while offering no definite answer on the first point. Acknowledging that Juror 0552's words as transcribed do not provide crystal clarity, the Court recalls her obvious discomfort with this line

10

of questioning, exemplified by her "[y]es, no" stumble, slow answers, and body language. This unease left the Court with the distinct impression that Juror 0552 has put money into Wilkerson's account and was reluctant to admit it. Wilkerson's own brief concedes that transfers occurred. *See* Def.'s Reply Br. at 7 (stating that Juror 0552 "occasionally sent him some money").

In summary, Juror 0552 testified that in the period since soon after Wilkerson's trial ended until March of 2009, she has visited him at the jail on a monthly basis, had weekly telephone calls with him, exchanged with him a few letters, mentored his daughter, and contributed money to his prison account. Here is a juror who asked to be excused from the jury essentially because she thought that the defendant was being unfairly punished and was upset about it; soon after the trial visited the defendant in jail on her own initiative; and then continued a steady, deepening relationship with him over the next several years. In light of this extraordinary background, Juror 0552 can hardly be thought of as a neutral witness in this matter.

Indeed, these facts compellingly suggest that Wilkerson and Juror 0552 share an intense relationship, yet at the hearing Juror 0552 would not be pinned down on how close their relationship is. Despite all her interaction with Wilkerson, when the Court asked Juror 0552 to describe the relationship, she resisted calling it even a friendship: "I don't know if [I] could say we were friends being as though I didn't know him prior to all of this." *Id.* at 45. She also dodged the Court's question whether she had talked to Wilkerson about what life would be like for them if he won his case and got released, answering only that "I really didn't think relief was possible." *Id.* Asked what she and Wilkerson discussed during all their visits, if not the facts of this case, Juror 0552 gave the vaguest of responses: "It could have been just general things." *Id.*

Juror 0552's reticence in explaining the precise nature of her relationship with Wilkerson

11

convinces the Court that the relationship has a powerful hold on her. When testifying, Juror 0552 undoubtedly kept in mind that the more she let on about how close the relationship is, the less credible her testimony would appear. Though she testified forthrightly in other respects, she plainly felt that she had something to hide on the subject of how much she feels for Wilkerson. The Court is left with no doubt that she cares for him and wants to help him. Her allegations must be viewed through that lens.

### B.  Discussion Between Juror 0552 and Wilkerson of Her Allegations of Juror Misconduct

Juror 0552's desire to help Wilkerson is evident from her very first meeting with him in October 2004. She testified that during that visit, she let him know her feelings about the trial, her willingness to testify if needed for appeals, things that went on during jury deliberations, the different jurors and their personal feelings, and her view that the conviction was based more on personal considerations than facts. *Id.* at 19-20. While unsure whether in that first visit she specifically discussed with Wilkerson the allegation that one juror said her relative was killed by a drug dealer,[5] she believes that she did raise with him the allegation that a juror had sat on a prior trial of his. *Id.* at 20. She testified that she took no further action as a result of that meeting in terms of researching the case, talking to other people about it, or trying to contact Wilkerson's counsel. *Id.* at 20-21. Nor, she testified, did she discuss or reach an understanding with Wilkerson about whether he would do anything about her concerns. *Id.* at 21. She recollects that on her second visit, she asked Wilkerson whether he had alerted his attorneys to her concerns and

---

[5] Regarding the allegation that a juror had a relative killed by a drug dealer, Juror 0552 testified that, "I am sure at some point that I advised him of all of it," but "I am not sure when I spoke to him about it." *Id.* at 23.

12

he indicated that he had not. *Id.*

Juror 0552 testified that she was prompted to write the March 2005 letter after reading an article in the Washington Post about the sentencing of other defendants in Wilkerson's case, including Kevin Gray. *Id.* at 18, 23. She testified that she did not tell Wilkerson beforehand that she was going to write the letter, and afterward did not show it to him, although she did tell him she had written it. *Id.* at 23-24.

Juror 0552 traced the genesis of her September 2008 letter to Wilkerson telling her that he had not yet had any final resolution of his case. *Id.* at 26-27. She testified that in advance of writing that letter, she did not talk to Wilkerson about the allegations raised therein, explaining that, "It was not necessary to continue to discuss the allegations. I know what happened, and after that no more discussion with regard to it." *Id.* at 27. Nor, she testified, did she discuss with Wilkerson the nature of the July 1, 2009 hearing and what would happen at the hearing. *Id.* She testified that, more generally, she has not discussed these allegations with any family members, friends, Wilkerson's friends or associates, lawyers, or investigators. *Id.* at 27-28.

Were it taken at face value, this testimony would be largely innocuous. Yet, Juror 0552 admits that, at least to some degree, she has discussed her allegations with Wilkerson before raising them with the Court, creating a possibility of collusion.[6] Defense counsel himself surely

---

[6] As suggestive—though by no means conclusive—evidence of collusion, the Court notes the evolution of Juror 0552's request to present her concerns to the Court. In her March 2005 letter, she states merely that "I would like to address these concerns to you in more detail if possible." This statement implies an *ex parte* discussion with the Court. By contrast, in her September 2008 letter, Juror 0552 makes a more sophisticated proposal: "I am more than willing to appear in court in the presence of you, the prosecutors, and the defendant and his counsel if necessary." Here, Juror 0552 contemplates an adversarial proceeding consonant with the *Edelin* procedure, *see supra* n.3, that the Court—as known to Wilkerson from discussions at the January
(cont'd)

had this danger in mind when, upon learning early on of Juror 0552's first visit with Wilkerson and her allegations, he told Wilkerson that "it was not a good idea for Mr. Wilkerson to speak with the juror" and "advised against meeting any further with the juror." Def.'s Renewed Mot. for a Hr'g to Investigate Alleged Jury Misconduct (Docket No. 2367) at 7 & n.8. It bears emphasis that the Court did not receive Juror 0552's undated first letter to the Court until March 17, 2005, approximately five months *after* she started visiting Wilkerson at the jail. Moreover, as with Juror 0552's self-evident reluctance to acknowledge the full extent of her relationship with Wilkerson, the Court suspects that she may not be divulging the full extent of her discussion with him about these allegations. Their authenticity is thus all the more questionable.

### C.     The Court Doubts the Credibility of Juror 0552's Allegations

"[A] Court has discretion to assess the credibility of jurors' testimony." *Edelin*, 283 F. Supp. 2d at 15 (citing *Bertoli*, 40 F.3d at 1395; *Smith v. Phillips*, 455 U.S. at 217 n.7)). Though unable to conclude definitively that Juror 0552's allegations are false, the Court finds ample basis in the record to doubt her credibility. In her note to the Court asking to be excused from the jury, *see supra* Part II.A, Juror 0552 made a telling admission: "Because I feel so strongly about this, it may affect my decisions in this matter. In other words a possible bias decision [sic]." *Wilkerson*, 2009 WL 2001326, at *1. In the years since, as Juror 0552 developed a close relationship with Wilkerson, her self-confessed "possible bias" could only have strengthened; it is now not so much a possibility as a certainty. After careful consideration of her history in this case, what she

---

2007 status conference—was contemplating. Yet, according to Wilkerson, Juror 0552 is a legal novice who "clearly has no conception what legal remedies are available to Mr. Wilkerson." Def.'s Reply Br. at 7. From where, then, did she get the idea that an adversarial hearing would be more palatable to the Court?

admits, and what she prefers to conceal, the Court is not satisfied that Juror 0552 makes credible allegations.

### III. A Further Hearing Would Unduly Impose Upon Other Jurors

In addition to, and in part because of, the Court's lack of confidence in Juror 0552's allegations, the Court finds that a further hearing to explore the allegations would unduly impose upon other jurors who would be called to testify. Based on Juror 0552's description of the two jurors who uttered the alleged prejudicial statements, Wilkerson identifies five jurors as the possible offenders, *see supra* n.4, and suggests that the Court summon them for questioning to verify Juror 0552's allegations.

The Court rejects this proposal. With questionable allegations and only two jurors genuinely implicated, there is inadequate justification for summoning five of them essentially to try to get them to point fingers at each other. *See Edelin*, 283 F. Supp. 2d at 14 ("The more 'speculative or unsubstantiated' the allegation of misconduct, the less the burden to investigate." (citing *Bertoli*, 40 F.3d at 1395)). Such a hearing would unduly burden these five jurors, who have already given an arduous two months of service at trial in circumstances so dangerous that their identities had to be concealed even from each other. Case law in this Circuit establishes avoidance of undue burden on jurors as a valid reason for denying a hearing of the type that Wilkerson proposes. *See United States v. Morrow*, 412 F. Supp. 2d 146, 173-74 (D.D.C. 2006) ("[T]he Court refuses Defendants' invitation to conduct a further evidentiary hearing by recalling all jurors in order to question them about their relationship with dismissed Juror # 4. Further hearings would simply constitute a baseless 'fishing expedition' into an unfounded pond . . . ."); *Edelin*, 283 F. Supp. 2d at 13 ("The prevention of 'juror harassment' through extensive

questioning and cross-examination is a legitimate reason to curtail a hearing or not to call jurors in for questioning." (citing *Williams-Davis*, 90 F.3d at 499; *Williams*, 822 F.2d at 1189)).

The Court is not swayed by Wilkerson's emphasis on his entitlement to a hearing to explore Juror 0552's allegations. He is correct that the Supreme Court "has noted the general principle 'that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.'" *Boney*, 977 F.2d at 634 (quoting *Smith v. Phillips*, 455 U.S. at 215). Yet, Wilkerson overlooks that the Court has already accorded him this remedy by conducting the *voir dire* of Juror 0552 on July 1, 2009. What Wilkerson asks for now is a *second* hearing to show what the first one did not. The law does not entitle him to that opportunity.

### IV. Allegation That Juror May Possibly Have Sat on a Previous Trial of Wilkerson Is Too Uncertain to Trigger Consideration

In her September 2008 letter, Juror 0552 wrote that, "one juror claimed to have possibly sat on one of [Wilkerson's] previous cases that were held at the Supreme Court."[7] On its face, the allegation as written states a speculative concern, as it is only possible—not certain—that a juror sat on a prior trial of Wilkerson. Nor did Juror 0552's testimony on July 1, 2009 allege any greater certainty. As Wilkerson's brief states, "[a] complete review of the transcript fails to reveal a single instance where Juror 0552 claimed that a juror said she 'definitely' remembered having sat on a prior trial. She [Juror 0552] consistently testified that this juror indicated only that she **may** have been a juror in a prior case." Def.'s Reply Br. at 6 (emphasis in original). Given the intrinsic uncertainty of this allegation, the Court finds it unworthy of consideration.

---

[7] Presumably, the intended reference here is to D.C. Superior Court. Wilkerson reports that he was the subject of three trials there from 1993 to 1994. *See* Def.'s Proposed Questions for Juror 0552 (Docket No. 2399) at 8 n.5.

*See Edelin*, 283 F. Supp. 2d at 14 ("The more 'speculative or unsubstantiated' the allegation of misconduct, the less the burden to investigate." (citing *Bertoli*, 40 F.3d at 1395)).

## CONCLUSION

The Court rejects Wilkerson's motion for a new trial and declines to hold a further hearing to explore Juror 0552's allegations. The Court finds that Juror 0552 lacks credibility, that a further hearing to question other jurors would be unduly burdensome, and that the allegation that a juror may possibly have sat on a prior trial of Wilkerson can be dismissed out of hand as too speculative.[8]

An order accompanies this Memorandum Opinion.

September _14_, 2009

                    _____
                    Thomas F. Hogan
                    U.S. District Judge

---

[8] In the final paragraph of his motion, Wilkerson argues that the Court's delay in resolving this and his other post-trial motions has prejudiced him and violated his due process right to speedy rulings and a speedy sentencing. The Court agrees that the delay is unfortunate, but rejects the claims of prejudice and violation of due process. Indeed, Wilkerson himself is responsible for no small part of the delay. In the post-verdict phase, defense counsel has repeatedly sought—and the Court has granted—extensions of time that have slowed resolution of the case. *See, e.g.*, Docket Nos. 2105, 2127, 2134, 2155, 2184, 2277 (Wilkerson's motions for extension of time to file).