**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

SEP 2 2 2009

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 00-0157-15 (TFH)** |
| | ) | |
| **LARRY WILKERSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

During the 1990s, a group of men led by Kevin Gray and Larry Moore distributed large

quantities of narcotics across Washington, D.C., using violence to promote their operations.  An

associate of Gray and Moore during this period was the defendant, Larry Wilkerson.  He, Gray,

Moore, and eighteen others were eventually prosecuted on charges stemming from this drug ring.

Wilkerson was tried separately from the other defendants.  Following a two-month trial, on

September 22, 2004, a jury found him guilty of nine counts related to narcotics conspiracy, RICO

conspiracy, and the murders of Marvin Goodman, Christopher Burton, and Scott Downing.[1]

Since the verdict, Wilkerson has filed numerous motions attacking the validity of his trial.

Pending resolution of those motions, he has not yet been sentenced.  The Court now addresses

seven of Wilkerson's motions, specifically his (1) Motion for Judgment Notwithstanding the

Verdicts and to Vacate the Verdicts as Being Against the Weight of the Evidence (Docket No.

2203); (2) Motion for a New Trial Based on the Government's Failure to Disclose *Brady*

Evidence Regarding Rodman Lee and for Asserting Inconsistent Prosecution Theories (Docket

---

[1]  The jury found Wilkerson not guilty of two counts related to the murder of a fourth
person, Darrell Henson.

No. 2201); (3) Motion to Compel the Government to Disclose the Complete Grand Jury

Testimony of Rodman Lee (Docket No. 2269); (4) Motion for a New Trial Based on Court's

Rulings Denying an Opportunity to Present Exculpatory Evidence Regarding the Christopher

Burton Homicide (Docket No. 2196); (5) Motion to Compel the Release of Government Notes

Relating to Devin Ebron (Docket No. 2192); (6) Motion for a New Trial Based on Newly

Discovered Evidence (Docket No. 2342); and (7) Motion for Dismissal or a New Trial Based on

Prosecutorial Misconduct Regarding Government Witness Donney Alston (Docket No. 2198).

For the reasons set forth below, the Court will deny each of these motions.

## ANALYSIS

The Court's discussion breaks down the above-listed seven motions into four groups.

Part I focuses solely on the Motion for Judgment Notwithstanding the Verdicts and to Vacate the

Verdicts as Being Against the Weight of the Evidence. Part II addresses the second and third

motions related to the impact on this case of Rodman Lee, another drug dealer associated with

Kevin Gray. Part III deals with the fourth, fifth, and sixth motions, all of which relate to the

murder of Christopher Burton. Part IV examines the seventh motion relating to alleged

prosecutorial misconduct as to government witness Donney Alston.

I.    **Motion for Judgment Notwithstanding the Verdicts and to Vacate the Verdicts as Being Against the Weight of the Evidence**

In this motion, Wilkerson asks the Court either to enter a judgment of acquittal or to

vacate the verdicts and convene a new trial. The Court must undertake two distinct, but related,

evaluations: (1) whether the evidence was sufficient to support the verdicts, and, in the

alternative, (2) whether the evidence weighs against the verdicts strongly enough that the

2

interests of justice warrant a new trial. *See Tibbs v. Florida*, 457 U.S. 31, 37-38 & n.11 (1982) (explaining "the difference between a reversal stemming from insufficient evidence and one prompted by the weight of the evidence"). Wilkerson offers two reasons why the government's evidence is inadequate to sustain the verdicts. With respect to the murder counts, he claims that the government's case was fatally undermined by witnesses' contradictory testimony. With respect to the conspiracy counts, he contends that the evidence shows that the Gray-Moore operation terminated outside the relevant statute of limitations. Because neither of these arguments satisfies the high threshold required to override a jury's finding, the Court will neither enter a judgment of acquittal nor vacate the verdicts.

## A.    Legal Standards

FED. R. CRIM. P. 29(c)(2) provides that "the court on the defendant's motion must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction." This rule governs Wilkerson's Motion for Judgment Notwithstanding the Verdicts. "[T]he standard for overturning a guilty verdict on the grounds of insufficiency of evidence is a demanding one." *United States v. Monroe*, 990 F.2d 1370, 1373 (D.C. Cir. 1993) (citation and internal punctuation omitted). The court's inquiry is limited to "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "[T]his inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Id.* at 318-19 (internal quotation omitted) (emphasis in original). In other words, the reviewing court is "not a second jury weighing the evidence anew." *United States v. Poston*, 902 F.2d 90, 94

(D.C. Cir. 1990). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. To prevail on this claim, Wilkerson must show that the jury's verdicts objectively lack any foundation.

The Court takes a less deferential approach in reviewing Wilkerson's Motion to Vacate the Verdicts as Being Against the Weight of the Evidence. This motion is governed by FED. R. CRIM. P. 33(a), which provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." On this motion, the Court has greater discretion to make its own judgment about whether the verdict is just in light of the evidence adduced at trial:

> When a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, the issues are far different . . . . The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Tibbs*, 457 U.S. at 38 n.11 (quotation omitted). "A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the [reviewing] court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Id.* at 42. This second-guessing "discretion should be exercised sparingly," *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992), however, limited to situations presenting "a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Morales*, 902 F.2d 604, 606 (7th Cir.

1990); *see also United States v. Ruiz*, 105 F.3d 1492, 1501 (1st Cir. 1997) ("Where a new trial

motion is based upon the weight of the evidence, the court may not order a new trial unless it is

quite clear that the jury has reached a seriously erroneous result." (internal quotation omitted)).

### B.    Inconsistency of Witness Statements

Wilkerson challenges each of the jury's verdicts with respect to the Scott Downing,

Christopher Burton, and Marvin Goodman murders.  According to Wilkerson, the government's

case for each murder depended on witness testimony that no reasonable jury would have believed

and that the Court should not accept.  Illustrative of Wilkerson's general strategy is his treatment

of the Marvin Goodman counts.  Goodman, a sometime acquaintance of Gray, Moore, and

Wilkerson, was killed by multiple gunshots in 1992.  The government and Wilkerson concur that

Goodman, a heroin user, was murdered in retaliation for stealing drugs.  The two sides agree on

little else, however.  For its part, the government argues that Goodman stole heroin from the

Gray-Moore crew and was later killed by Wilkerson, Gray, and others.  Wilkerson, on the other

hand, posits that Goodman was murdered by two men known as "Cat Man" and Kenny Hill.  At

trial, each side offered witness testimony to support its respective narrative, and the jury

ultimately found Wilkerson guilty on all of the Goodman counts.

Wilkerson does not argue that the government's proffered testimony, if taken at face

value, provides insufficient evidence that Wilkerson helped to murder Goodman.  Instead,

Wilkerson claims that the government's witnesses had perhaps colluded and were not believable,

so that the government offered an insufficient amount of *credible* testimony to support the jury's

verdicts.  In support of his claim, Wilkerson observes that government witnesses contradicted

each other on subjects including whether Goodman obtained some of his stolen drugs from a

5

safe; who discovered the theft; whether Goodman facilitated his theft by breaking and entering through a kitchen or a closet; whether Kevin Gray ever used the alias "Cat Man"; and whether Goodman was inside a car when killed. Wilkerson claims that these discrepancies so discredit the government's witnesses that the jury's verdicts were beyond all reason and constitute an affront to justice.

The Court finds that these testimonial disagreements are insufficient to displace the fact-finding role of the jury. *See United States v. Greenstein*, 153 F.2d 550 (2d Cir. 1946) ("Any doubts which might arise from this uncertainty and this contradiction were for the jury alone; they were not a ground for withdrawing the testimony from their consideration."). The jury has wide latitude to determine for itself the credibility of a witness. *Johnson v. United States*, 426 F.2d 651, 655 (D.C. Cir. 1970) ("Of all the issues which are in the highest order for a jury one is hard pressed to suggest one more firmly intended and more plainly suited for jury determination than that of credibility."). The jury is instructed that such is not only its right, but indeed its responsibility as trier of fact: "You are the sole judge of the credibility of the witnesses. In other words, you alone are to determine whether to believe any witness and the extent to which any witness should be believed." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Instruction 2.11. This rule holds true even when there is serious reason to doubt the witness, such as mental retardation, *see United States. v. Benn*, 476 F.2d 1127 (D.C. Cir. 1973), or drug addiction, *see United States v. Hickey*, 917 F.2d 901 (6th Cir. 1990). Here, by contrast, there are no exceptional circumstances; the witnesses were competent and their testimony was not bald-faced fantasy.

Judgment notwithstanding the verdicts is inappropriate because a rational trier of fact

could have believed the government's witnesses in spite of their contradictions.  Where the

government witnesses differed in respect to the Goodman murder, they did so in ways the jury

might reasonably have dismissed as trivial or harmless, especially considering that the events at

issue occurred roughly a decade before trial:

> Inconsistencies or discrepancies in the testimony of a witness, or between the
> testimony of different witnesses, may or may not cause you to discredit such
> testimony. . . . In weighing the effect of the inconsistency or discrepancy, always
> consider whether it pertains to a matter of important or unimportant detail, and
> whether the inconsistency or discrepancy results from innocent error or intentional
> falsehood.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Instruction 2.11.  It is unclear,

for instance, why disagreements over Goodman's manner of theft—through a kitchen or through

a closet —should obviate all belief in the government's case.  This is particularly so because the

government's witnesses *agreed* on a great deal, most centrally the intention of Gray and his

colleagues to hunt down and kill Goodman.  The jury could rationally have credited that common

line of testimony over any number of minor inconsistencies and hence concluded that Wilkerson

was guilty.

Similarly, the jury did not reach an unreasonable conclusion with respect to the charges

related to the Scott Downing and Christopher Burton murders, since Wilkerson protests the

verdicts on those counts using the same flawed argument.  As with the Goodman murder,

witnesses who testified about the Downing and Burton murders were inconsistent on several

points.  Also as with the Goodman murder, however, those inconsistencies were not nearly so

critical as to render the jury's verdicts irrational.  As to each of the three murders, then,

Wilkerson fails to show a pattern of witness testimony so incompatible that it entirely precludes

rational belief in the government's evidence.  Though the government's proffered testimony may have been less than airtight, the verdicts were not beyond the pale of reason.

For the same reasons, upon its own review the Court does not find these testimonial inconsistencies so unsettling that the interests of justice require vacating the verdicts and holding a new trial.[2]  The collective evidence of Wilkerson's guilt is strong enough to satisfy the Court that the verdicts do not represent a miscarriage of justice.

### C.   Statute of Limitations Defense

Wilkerson next challenges the jury's finding that the Gray-Moore conspiracy existed as of November 17, 1995—the operative date for the statute of limitations.[3]  The jury's finding was unreasonable and against the weight of the evidence, Wilkerson claims, for two reasons: first, a variety of government and defense witnesses testified that Gray and Moore had squabbled in 1995 and 1996.  Second, this squabble coincided with Gray's decision to purchase drugs from two men not well-connected with Moore: Rodman Lee and Ronald Alfred.  Wilkerson claims

---

[2]  In determining what the interests of justice require, the Court heeds the Second Circuit's guidance:

> Manifest injustice cannot be found simply on the basis of the trial judge's determination that certain testimony is untruthful, unless the judge is prepared to answer "no" to the following question: "Am I satisfied that competent, satisfactory and sufficient evidence in this record supports the jury's finding that this defendant is guilty beyond a reasonable doubt?"  In making this assessment, the judge must examine the totality of the case.  All the facts and circumstances must be taken into account.  An objective evaluation is required.  There must be a real concern that an innocent person may have been convicted.  It is only when it appears that an injustice has been done that there is a need for a new trial "in the interest of justice."

*Sanchez*, 969 F.2d at 1414.

[3]  Except where otherwise expressly provided by law, the statute of limitations for non-capital offenses—such as Wilkerson's narcotics and RICO conspiracy counts—is five years.  *See* 18 U.S.C. § 3282.  Wilkerson was indicted on November 17, 2000.

that the diversification of Gray's cocaine supply confirms his intention to break with Moore.

The record contains ample reason to reject Wilkerson's theory.  The government presented several witnesses who testified that Gray and Moore frequently quarreled before reuniting and resuming their normal course of business.  One of Wilkerson's former colleagues testified that the Gray-Moore operation itself regarded death as the only valid means of withdrawing from the conspiracy.  Other government witnesses testified not only that Gray and Moore consistently reconciled their differences, but indeed that the pair continued orchestrating crimes into the late 1990s.

In light of this evidence, the Court will not disturb the verdicts on the conspiracy counts.  It was within the province of a reasonable jury to accept the government's evidence over Wilkerson's.  That evidence persuades the Court, too, that no miscarriage of justice would result from letting the jury's verdicts stand.

## II.     Motions Relating to Rodman Lee Evidence

As already noted, Wilkerson maintains that the Gray-Moore operation terminated outside the relevant statute of limitations.  Key to this claim is the one-time relationship between Gray and Rodman Lee, a cocaine dealer who in 1996 pled guilty to narcotics charges.  According to Wilkerson, Gray's decision to acquire drugs from Lee—as opposed to Moore—constituted a separate conspiracy that displaced the Gray-Moore operation.  After trial, Wilkerson obtained what he contends is key evidence in support of his theory: the proffer of evidence accompanying Rodman Lee's plea agreement ("the Lee proffer").  The proffer contains the following passages describing the Lee enterprise:

From in or about sometime in 1992, to on or about May 31, 1996 . . . Rodman David

9

Lee . . . was a principal administrator, organizer, supervisor and leader with respect to a group of individuals who, collectively, were responsible for the distribution of more than 150 kilograms of cocaine and more than 1.5 kilograms of cocaine base in the District of Columbia, the State of Maryland and elsewhere. . . .

An investigation has determined that in addition to [Lee], the conspiracy has included, but has not been limited to, the following members who have participated as co-conspirators, either continuously, or at various times during the existence of the ongoing enterprise: [the proffer lists 20 names, including Kevin Gray].

. . .

Sometime in late 1994, the exact date of which is unknown, Rodman David Lee began to receive shipments of cocaine base, and later cocaine hydrochloride . . . . This continued up until May 31, 1996. Throughout this period of time, Rodman David Lee supplied [Gray and others] with multiple kilogram quantities of cocaine hydrochloride and cocaine base.

Def.'s Mot. for a New Trial (Docket No. 2201), Ex. 3 (copy of factual proffer). In sum, the proffer depicts Lee as a ringleader of a large conspiracy in which Kevin Gray was involved.

Wilkerson reads the Lee proffer as further proof—endorsed by the government—that Gray joined a separate conspiracy with Lee *rather* than remain part of a conspiracy with Moore. On the basis of this reading, Wilkerson's Motion for a New Trial (Docket No. 2201) presents two arguments. First, Wilkerson asserts that the government's failure to disclose the Lee proffer violated the prosecutorial duties set forth in *Brady v. Maryland*, 373 U.S. 83 (1963). Second, Wilkerson maintains that the government has deprived him of due process of law under the Fifth Amendment by prosecuting Lee under one theory (that Gray joined a conspiracy run by Lee) and Wilkerson on another (that Lee was part of the Gray-Moore conspiracy). In an additional Motion to Compel (Docket No. 2269), Wilkerson requests the complete transcript of Rodman Lee's grand jury testimony taken in the Kevin Gray case because he believes it may help substantiate his theory. As explained below, all of these claims lack merit.

10

### A.    *Brady* Claim

*Brady* requires the prosecution to disclose evidence to the accused only where (1) the evidence is favorable to the accused because it is either exculpatory or impeaching; (2) the evidence has been suppressed by the government, either willfully or inadvertently; and (3) the accused is prejudiced as a result of the government's suppression. *See United States v. Andrews*, 532 F.3d 900, 905 (D.C. Cir. 2008) (citing *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). The proper remedy for a *Brady* violation is a new trial. *See United States. v. Brodie*, 524 F.3d 259, 268 (D.C. Cir. 2008).

The Court resolves Wilkerson's claim with reference only to the third *Brady* prong, finding that Wilkerson has not shown that he suffered prejudice from the government's failure to disclose the Lee proffer.  Under *Brady* and its progeny, withheld evidence is prejudicial only where it is material, *i.e.*, where there is a reasonable probability that the evidence would have given rise to a different outcome at trial. *United States v. Bagley*, 473 U.S. 667, 682 (1985) (explaining that a "reasonable probability" is one "sufficient to undermine confidence in the outcome").  Wilkerson has the burden of proving materiality, *Strickler*, 527 U.S. at 289, meaning he must show that the Lee proffer was material with respect to the statute of limitations question.

Wilkerson fails to carry his burden of demonstrating materiality because his argument rests on the faulty premise that the Gray-Lee conspiracy outlined in the Lee proffer could not have simultaneously coexisted with a Gray-Moore conspiracy.  The proffer itself lacks discrete facts that would show this type of incompatibility, listing no dates, times, people, places, or events indicating that Gray broke with Moore.  Wilkerson is left to rely chiefly on the proffer's characterization of the Gray-Lee relationship as one in which Lee was a "principal administrator,

organizer, supervisor and leader" of a "conspiracy" involving Gray.[4]  Yet this proposition does

nothing to explain why a Gray-Lee conspiracy could not overlap with a Gray-Moore conspiracy.

As a starting point, the proffer offers little insight into the precise relationship between

Gray and Lee.  The applicable portions of the proffer are written in expansive language designed

to describe broad swaths of Lee's operations.  That this grammatical dragnet swept up Gray (in

two long lists of co-conspirators) says little about how, precisely, Gray figured into Lee's

conspiracy.  Indeed, the proffer gives no indication that Gray and Lee were anything beyond

customer and supplier.  The lack of any further role for Gray, while not settling the issue, cuts

against the inference that Gray took up a conspiracy with Lee at the expense of a leadership

position in a conspiracy with Moore.

Yet even assuming that Lee's conspiracy frequently and critically involved Gray, that

relationship would prove nothing about Gray's relationship with Moore.  Wilkerson reaches his

conclusion only by *assuming* that where one person leads a conspiracy, that person and his co-

conspirators are incapable of operating in a second conspiracy.  While one can certainly imagine

a factual scenario in which that rule would hold true as applied—in rival gangs, for instance—the

proffer and other evidence in the record offer no facts that demand such an inference in the case

---

[4]  Wilkerson also relies on certain other documents he obtained, mainly records of law enforcement interviews of Lee.  *See* Def.'s Notice of Filing of Additional Undisclosed *Brady* Docs. (Docket No. 2254).  According to Wilkerson, those documents demonstrate that Lee was part of a continuing criminal enterprise run by the Zebowski brothers in which Gray was also involved.  Noting that these documents nowhere mention Rodney Moore, Wilkerson concludes that Gray must have been conspiring with the Zebowskis and Lee to the exclusion of Moore, and that Lee could not have been part of any Gray-Moore conspiracy.  This conclusion is riddled with leaps of logic.  For one thing, Wilkerson ignores that the Zebowskis, Lee, Gray, and Moore could all have been running overlapping conspiracies.  Secondly, Wilkerson overlooks that Lee did not need to deal with or even know of Moore to be part of a Gray-Moore conspiracy; the link could be through Gray alone.

of Kevin Gray.

The possibility of overlapping conspiracies is well-recognized in the law.  At the heart of a legal conspiracy is an agreement between two or more people to commit a crime.  *See United States v. Wilson*, 160 F.3d 732, 737 (D.C. Cir. 1998) ("The existence of an agreement is the *sine qua non* of the statutory crime of conspiracy.").  Because an individual may have multiple agreements with multiple people, there is nothing inherently impossible about several conspiracies existing simultaneously.  *See, e.g., United States v. Townsend*, 924 F.2d 1385, 1395-1402 (7th Cir. 1991) (finding three separate conspiracies between three different suppliers and a common purchaser).  And because only the substance of the agreement is important for a conspiracy charge, the rank, status, or relationship of the conspirators is hardly dispositive; a criminal mastermind may organize one complex conspiracy but play a bit part in several others.

As both a factual and a legal proposition, therefore, it is possible for the conspiracy described in the Lee proffer to have coexisted with the Gray-Moore conspiracy.  Given the informal complexity of narcotics operations, Lee, Gray, and Moore could conceivably have formed several overlapping conspiracies throughout the years.  Gray, for instance, could have simultaneously made multiple, independent cocaine purchases as part of the Rodman Lee conspiracy, as part of the Gray-Moore conspiracy, or as part of any number of other conspiracies. For his part, Lee could have led one conspiracy—at times employing Kevin Gray—while at other times merely "serving" in separate conspiracies.  It is also possible to understand the Gray-Lee conspiracy as a sub-conspiracy of the Gray-Moore operations.

Given the potential range of these conspiratorial agreements, the Lee proffer can shed no light on the relationship between Gray and Moore.  The proffer describes only the factual

13

circumstances surrounding a *single* conspiratorial agreement, saying nothing about the possibility

of other agreements or their termination.  Consequently, the proffer has limited bearing on

Wilkerson's statute of limitations argument and does not undermine confidence in the outcome

of the trial.  A new trial is thus unwarranted under *Brady*.

### B.    Claim for Inconsistent Theories of Prosecution

Leaving aside all the possible ways that the operations of Lee, Gray, and Moore could

have been related, Wilkerson's second claim focuses on the theories that the government has

actually advanced.  He argues that the government has impermissibly offered two mutually

exclusive portraits of Rodman Lee.  Specifically, Wilkerson contends that it was inconsistent for

the government first to prosecute Rodman Lee under the theory of a "Rodman Lee conspiracy

including Kevin Gray," and then to later prosecute Larry Wilkerson under the theory of a "Kevin

Gray and Rodney Moore conspiracy including Rodman Lee."  Wilkerson notes that while the Lee

proffer describes Lee as a ringleader of his own conspiracy under whom Gray worked, during

Wilkerson's trial the government portrayed Lee as having joined the Gray-Moore conspiracy.

The D.C. Circuit has not yet addressed whether the government is constitutionally

estopped from prosecuting defendants under mutually inconsistent theories.  More broadly,

"[t]here is no clear consensus in the federal courts on whether a prosecutor may be precluded

from raising an argument at a criminal trial because the government has asserted a factually

incompatible argument in pursuing a conviction against another defendant at another trial."

*United States v. Urso*, 369 F. Supp. 2d 254, 263–264 (E.D.N.Y. 2005) (collecting and comparing

cases addressing application of judicial estoppel to government prosecutors).

This question of law can be saved for another day, however, because the Court rejects

14

Wilkerson's allegation that the government prosecuted Rodman Lee and Kevin Gray using mutually inconsistent theories. Consistent with the Court's discussion above, *see supra* Part II.A, the Lee proffer is entirely compatible with the government's representation at Wilkerson's trial. To wit, Wilkerson does not explain why a Lee conspiracy involving Gray could not have coexisted simultaneously with a Gray-Moore conspiracy involving Lee. The inconsistency that Wilkerson perceives is a result of his own assumptions, not any factual impossibility. Because the allegation of inconsistency does not withstand scrutiny, Wilkerson's claim lacks merit.

### C.   Motion to Compel Disclosure of Rodman Lee's Grand Jury Testimony

In a final claim relating to Rodman Lee, Wilkerson petitions the Court to compel the disclosure of Lee's grand jury testimony ("the Lee testimony"). Citing already available excerpts of that testimony,[5] Wilkerson claims that it—like the Lee proffer—shows that Gray and Moore terminated their conspiracy outside the statute of limitations.

There exist only a few exceptions to the "ancient" rule that "the proceedings of . . . grand juries [are] subject to near absolute secrecy." *United States v. E-Gold, Ltd.*, 521 F.3d 411, 420 (D.C. Cir. 2008). For one, grand jury testimony is subject to the rule laid down in *Brady*. *See Tierney v. United States*, 410 U.S. 914, 916 n.2 (1973) (noting that "grand jury testimony is regularly disclosed to criminal defendants without court order pursuant to *Brady*"). In addition, FED R. CRIM. P. 6(e)(3)(E)(i) allows district courts to authorize disclosure of grand jury matters "in connection with a judicial proceeding" if the party requesting disclosure demonstrates a "particularized need" or "compelling necessity" for the testimony. *See Smith v. United States*,

---

[5] Prior to the trial of other defendants in this case, the government released portions of Lee's grand jury testimony as part of its *Jencks/Giglio* disclosures.

423 U.S. 1303, 1304 (1975). In other words, "disclosure is appropriate only in those cases where the need for it outweighs the public interest in secrecy, and . . . the burden of demonstrating this balance rests upon the private party seeking disclosure." *Douglas Oil Co. of California v. Petrol Stops Northwest*, 441 U.S. 211, 223 (1979).

It is unclear whether Wilkerson seeks the Lee testimony as *Brady* material itself, or only because it relates to the Lee proffer. Either way, Wilkerson not has properly linked the Lee testimony to his statute of limitations defense. An initial problem is that Wilkerson overstates what the available grand jury testimony demonstrates about the relationship between Lee and Gray. Wilkerson cites Lee's testimony as to how Gray wanted to deal with two associates who were thought to be cooperating with the police. First, Lee testified that when Gray heard that Lee had placed a bounty on one suspected cooperator's head, Gray responded "Oh, fuck that shit. Oh, don't worry about it. Don't worry about a thing." Def.'s Mot. to Compel, Ex. 3. Second, Lee testified that Gray said that another suspected cooperator "was going to have to go," and that Gray particularly did not like this person because they were both dating the same woman. *Id.* From this testimony, Wilkerson tenuously concludes that Gray was willing to act as an enforcer for Lee and that Gray may have become a member of a separate conspiracy of which Lee was a captain. Yet, Gray's response to Lee's bounty is ambiguous on its face, nowhere expressing a clear intent to eliminate the cooperator. As to the second cooperator, Lee's testimony itself suggests that Gray's motive may have been romantic competition as much as any service to Lee. Ultimately, the Lee testimony that Wilkerson cites is unclear about the nature of Gray's relationship with Lee.

The more important problem is that, even if Wilkerson's view was more than mere

conjecture, he has not articulated a means by which the Lee testimony would indicate that Gray broke with Moore—the critical consideration for his statute of limitations defense.  As discussed above, *see supra* Part II.A, it is not enough that Gray worked with or even for Lee; rather, Wilkerson must show that Gray conspired with Lee *to the exclusion of Moore*.  The excerpted portions of Lee's testimony offer no such evidence, and Wilkerson can only guess at what the remainder of that testimony contains.  Whether Wilkerson seeks the grand jury records as *Brady* material or as evidence attendant to *Brady* material, such general speculation cannot yield disclosure.  *Cf. United States v. Short*, 671 F.2d 178, 187 (6th Cir. 1982) ("A general claim . . . that disclosure of grand jury transcripts would reveal exculpatory evidence is not sufficient to satisfy the requirement of a showing of particularized need."); *United States v. Edelson,* 581 F.2d 1290, 1291 (7th Cir. 1978) (per curiam) (finding speculative assertions inadequate to constitute a "particularized need" under FED R. CRIM. P. 6).  Accordingly, the motion to compel fails.

### III.    Motions Relating to the Murder of Christopher Burton

In January of 1993, Christopher Burton was killed by several shots from a 9mm handgun. According to the government, Burton's brother Shawn had a series of disputes with Wilkerson, culminating with Shawn shooting Wilkerson in the face.  The government claims that Gray set out to kill Shawn in retaliation for Wilkerson's injury, but upon a chance encounter settled for killing Christopher.  In the government's account, Gray was riding in a car driven by Wilkerson when they spotted Christopher Burton sitting in a car parked in the driveway of a relative's house.  The government alleges that Gray took the opportunity to ambush and kill Christopher Burton, then escaped in the car that Wilkerson was driving.

Wilkerson asks for a new trial on the Burton murder counts based upon a number of

rulings made at trial.  First, in his Motion for a New Trial Based on Court's Rulings Denying an

Opportunity to Present Exculpatory Evidence (Docket No. 2196), Wilkerson protests the Court's

refusal to admit into evidence the accounts of Officer Edward Torrence and Thomas Carthens.

Second, in that motion (Docket No. 2196), his Motion to Compel the Release of Government

Notes Relating to Devin Ebron (Docket No. 2192), and his Motion for a New Trial Based on

Newly Discovered Evidence (Docket No. 2342), Wilkerson disputes several rulings relating to

Devin Ebron, a potential defense witness who invoked his Fifth Amendment privilege and did

not testify.

As explained below, these motions are unpersuasive.  Evaluating the motions for a new

trial under the FED. R. CRIM. P. 33 standard discussed above, *see supra* Part I.A, the Court

concludes that, both individually and in the aggregate, these claims do not establish that any

miscarriage of justice has occurred.  Additionally, the Motion to Compel is unfounded.

### A.    Testimony of Officer Edward Torrence[6]

On his way to respond to the Burton crime scene, Officer Edward Torrence observed a

white Honda Acura speeding away from an area near the shooting.  Roughly two hours later, the

car (or one strikingly similar to it) returned, again going fast.  Officer Torrence stopped the Acura

and recovered a .380 caliber pistol from within.  The two men in the car had, and still have, no

known connections to Burton, Gray, or Wilkerson.

Wilkerson sought to have Officer Torrence testify to these facts at trial, with the defense

theory of course being that the two men in the Acura were responsible for Burton's murder.  The

---

[6] At trial, the Government stipulated to the essential facts to which Officer Torrence
would testify, if the Court determined that the testimony was admissible. *See* Govt.'s Omnibus
Opp'n (Docket No. 2274) at 42 n.8.

Court found the proposed testimony too speculative, noting that Burton's death and the car were connected only by their relative proximity.  In refusing to admit Officer Torrence's testimony, the Court cited two grounds: (1) the Acura incident was irrelevant under FED. R. EVID. 401 and therefore inadmissible under FED. R. EVID. 402, and (2) even if it were relevant, any probative value would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury under FED. R. EVID. 403.  Wilkerson asks the Court to revisit its ruling.

Keeping in mind that "courts of appeals afford broad discretion to a district court's evidentiary rulings," *Sprint/United Mgmt. Co. v. Mendelsohn*, 128 S.Ct. 1140, 1145 (2008), the Court affirms its earlier decision.  At most, Officer Torrence's testimony would have established that around the time Burton was murdered with one type of gun, two men nearby happened to be driving fast and possessed a different gun.  Without further evidence, the murder and the Acura incident are an unconnected coincidence.  Wilkerson's observation that the two men in the car had criminal records and one was carrying a knife does not bridge the gap.  There is simply no colorable basis to conclude that the Acura, the .380 pistol, and the two men are linked in any way to Burton, Gray, or Wilkerson.  Wilkerson's speculation that the Acura's passengers might have owned a 9mm, used it to kill Burton, and then discarded the weapon while hanging on to their "clean" .380 is just that: a completely uncorroborated guess.  The evidence is accordingly irrelevant under Rule 401 and therefore inadmissible under Rule 402, and even if it were found relevant, under Rule 403 its probative value is minimal in comparison to the potential for confusing and misleading the jury.  The Court therefore stands by its exclusion of Officer Torrence's testimony and declines to grant a new trial.

### B.    Statement of Thomas Carthens

On the night that Christopher Burton was murdered, the police interviewed a man named Thomas Carthens. As recounted in the police report of that interview, Carthens asserted that he witnessed the murder and gave a detailed physical description of the gunman. Wilkerson argues that this physical description does not match Gray, contradicting the government's account of the shooting and thereby helping to exculpate Wilkerson. As Wilkerson emphasizes, the reliability of Carthens' statement is supported by various factual details he gave—the location of the incident, the color and type of Burton's car, the number of shots fired, and so on—that match other evidence in the record. The government represents, however, that Carthens' reliability was critically undermined when, two months after the murder, he was interviewed again and partially recanted, stating that he had not seen the shooter's face.[7]

No doubt wary of this glaring inconsistency, Wilkerson chose not to call Carthens at trial, even though he was available to testify. Instead, Wilkerson sought to admit into evidence the police record of Carthens' initial interview. The Court, citing Carthens' contradictory statements and his history of drug use, found the interview inadmissible under FED. R. EVID. 803(8),[8] which

---

[7] Wilkerson argues that the Court should not accept this representation because the government has never submitted the recantation as proof. Yet, the Court observes that when the government first raised the recantation at trial while arguing this evidentiary issue, Wilkerson did not question the veracity of the government's representation. Even now, in his current motion, he still does not do so; rather, he only asks that the government be required to back up its representation with evidence. That is not required in this situation, however, where the truth of the representation was implicitly conceded at the time it was made and remains uncontested.

[8] Wilkerson had initially sought to admit the statement under FED. R. EVID. 807. This "residual" hearsay exception allows admission of hearsay evidence where "the statement [in question] is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." *Id.* Although Wilkerson later shifted his

(cont'd)

allows admission of certain public records "unless the sources of information or other circumstances indicate lack of trustworthiness." Wilkerson contends that the Court erred.

As with Officer Torrence, the Court stands by this evidentiary ruling. Carthens' statement as recorded in the police report is classic hearsay: an out-of-court statement offered for the truth of the matter asserted. FED. R. EVID. 801(c). Admission at trial of this statement via the police report thus depended on satisfying an exception to the hearsay rule. As the Court found at trial, the initial Carthens interview did not meet the trustworthiness requirement of Rule 803(8). In addition to the general reliability issues stemming from Carthens' history of substance abuse, his blatant self-contradiction made the initial interview unreliable on the particular point that Wilkerson wanted to highlight—the gunman's physical characteristics. When this issue was argued at trial, defense counsel himself reported that even up to then Carthens was still changing his story: "With respect to Mr. Carthens and his credibility, we spoke to Mr. Carthens a couple of times and including the other day in the hallway. . . . And frankly . . . we got a few different versions from Mr. Carthens." Trial Tr. (Aug. 25, 2004 A.M. Session) at 31. Wilkerson offers no new facts or arguments to spur a different conclusion about this issue now. The Court thus determines that its ruling was not improper and presents no occasion for a new trial.

## C.    Devin Ebron

Pursuant to its *Brady* obligations, the government in late 2001 notified Wilkerson of an off-the-record interview it had conducted with Devin Ebron. Ebron, who was not immediately affiliated with the Gray-Moore operation, had participated in the interview in advance of entering

---

rationale to FED. R. EVID. 803(8), the Court nonetheless addressed the statement's admissibility under Rule 807 and rejected it, since live testimony by Carthens himself was readily available and clearly more probative than his recorded statements.

into a plea agreement as a cooperator.  During the interview, Ebron reported that a man named

Reginald Diggs had in 1993 confessed to murdering Christopher Burton.  According to Ebron,

Diggs claimed to have killed Burton at the behest of Gray before hiding the murder weapon with

Ebron.  Ebron further recalled that he hid the weapon—which he said was a .380 caliber pistol,

rather than a 9mm—in the trunk of a car before Gray came to retrieve it from him.  This narrative

obviously contradicts the government's account of the Burton murder.

 Neither Diggs nor Ebron testified at trial; Diggs was murdered in early 2000, and Ebron,

worried about exposure to future prosecution, invoked his Fifth Amendment privilege.  With

those avenues blocked, Wilkerson attempted to admit Ebron's interview statements, via

testimony by a government agent, under the "statement against penal interest" exception to the

hearsay rule.  *See* FED. R. EVID. 804(b)(3).  Rule 804(b)(3) allows admission of hearsay evidence

where the statement in question is "so far tended to subject the declarant to . . . criminal liability .

. . that a reasonable person in the declarant's position would not have made the statement unless

believing it to be true."  *Id.*  Where such a statement is offered to exculpate the accused,

however, this exception is narrowed by adding a condition that "corroborating circumstances

[must] *clearly* indicate the trustworthiness of the statement."  *Id.* (emphasis added).  Apart from

this trustworthiness requirement, a further hurdle for admissibility is that Diggs' confession is

hearsay within hearsay, or "double-hearsay," since the proposed testimony incorporates not only

Diggs' statement to Ebron, but also Ebron's statement to the authorities.  Each of these out-of-

court statements must independently satisfy some exception to the hearsay rule.  *See* FED. R.

EVID. 805.

 At trial, after extensive consideration, the Court refused to admit the proposed testimony

22

into evidence, finding that there were not corroborating circumstances clearly indicating the trustworthiness of the statements from Diggs to Ebron and from Ebron to the authorities. Now, Wilkerson asks the Court to reexamine its exclusion of this testimony, overturn its ruling, and grant a new trial.

Keeping in mind that "findings of trustworthiness [under Rule 804(b)(3)] are reviewed for clear error," *United States v. Wilson*, 160 F.3d 732, 739 (D.C. Cir. 1998), the Court is satisfied that its ruling was sound. Simply put, this Court knows virtually nothing of Reginald Diggs or his conversation with Ebron. Little is known about Diggs' background; his relationship with Ebron, Gray, Moore, or Wilkerson; his relationship to Christopher Burton; or the circumstances under which Diggs confessed to Ebron.[9] Save for the words of Ebron, there is no real evidence that such a confession ever occurred.[10] Moreover, the weapon that Ebron claims he

---

[9] In his Motion to Compel the Release of Government Notes Relating to Devin Ebron, Wilkerson speculates that additional corroborative information about Diggs' relationship with Ebron and Gray and the context of the Diggs confession might be available in the government's notes, including FBI 302 reports. Wilkerson sought these notes from the government prior to trial, and at trial when the Ebron issue was argued, he asked the Court to order them turned over either to Wilkerson or for *in camera* review. The Court denied Wilkerson's request. Wilkerson now renews his request, and the Court again rejects it. However confident Wilkerson is that potentially corroborative information exists in these notes, he offers nothing to demonstrate as such and cites no helpful legal authority—only equitable considerations—for the Court to grant his request. To the degree that these notes contain exculpatory information, the government had a duty to turn them over under *Brady*. By not turning them over, the government represented that the notes were not exculpatory. The Court relies on that representation.

[10] The hardest evidence Wilkerson offers to corroborate the confession is Diggs' facial features. Working from Diggs' autopsy photographs, Wilkerson argues that Diggs' eyebrows and mustache resemble Thomas Carthens' recanted description of the shooter as having "thick eyebrows" and a "thick mustache." *See* Def.'s Mot. for a New Trial Based on Court's Rulings Denying an Opportunity to Present Exculpatory Evidence, at 35, 44. As already discussed, *see supra* Part III.B, Carthens' recanted statements were properly excluded from evidence as untrustworthy and are thus no basis for corroboration. Even if that were not the case, a set of

(cont'd)

hid on behalf of Diggs is a different type than the 9mm used to kill Burton.[10]   There is thus scant,

and certainly not clear, indication of the trustworthiness of Diggs' statement to Ebron.

Regarding the trustworthiness of Ebron's statement to the authorities, the Court based its

ruling in substantial part on the government's representation at trial that Ebron was not a reliable

as a cooperator.  Wilkerson takes great umbrage at the government's representation, arguing that

when using Ebron as a witness and cooperator in other cases, the government has had no such

qualms about his usefulness.  The government maintains that its representations in the separate

cases are in good faith, reflecting an evolving view of Ebron's reliability over time after he

performed poorly as a witness and did not pass a polygraph test.  Ultimately, this tangled dispute

about Ebron is irrelevant: his trustworthiness would become germane *only* if the initial hearsay

(Diggs' statement to Ebron) was independently corroborated.  The Court thus declines any re-

evaluation of whether Ebron's statement was trustworthy under Rule 804(b)(3), for the

underlying Diggs confession certainly was not.

## D.   First Motion Concerning Judicial Immunity

Even if Ebron had testified at trial, he would have been unable to offer his hearsay

evidence regarding Diggs' confession.  Wilkerson nonetheless attempted to call Ebron, who

promptly exercised his Fifth Amendment privilege.  In response, Wilkerson asked the Court to

---

matching eyebrows and mustache are not sufficiently corroborative to overcome the dearth of
substantive information regarding Diggs and his confession.

[10]   Wilkerson contends that a .380 caliber gun is so similar to a 9mm that Ebron and/or
Diggs may have mistaken one for the other.  He attaches to his motion an affidavit from a gun
expert attesting to the resemblance.  Putting aside the fact that Wilkerson did not present this
evidence of similarity when this issue was first argued, even if the Court were to assume the truth
of Wilkerson's speculation that Ebron's statement reflects a mistake about the caliber of the gun,
there is still far too little corroborating evidence to *clearly* indicate trustworthiness.

grant Ebron use immunity, which would prohibit the government from prosecuting Ebron based on any self-incriminating information he might reveal. The Court refused, disclaiming any authority to immunize Ebron. Although the value of Ebron to Wilkerson's defense was and remains questionable, Wilkerson now asks this Court to reconsider its ruling on immunity and order a new trial.

Per an explicit grant from Congress, the authority to grant use immunity flows from the government in the first instance, not the courts. *See* 18 U.S.C. § 6003 (mandating that the district court grant use immunity when so requested by the United States Attorney). The D.C. Circuit has firmly declined to interfere with the government's discretion under §6003, finding that to do so would unduly intrude upon the Executive branch:

> The cases are legion and uniform that only the Executive can grant statutory immunity, not a court. We are not an exception to this universal rule and have previously approved the view that it is not the proper business of the trial judge to inquire into the propriety of the prosecution's refusal to grant use immunity to a prospective witness.

*United States v. Lugg,* 892 F.2d 101, 104 (D.C. Cir. 1989) (internal citations and quotation omitted); *see also United States v. Doe,* 465 U.S. 605, 616 (1984) ("We decline to extend the jurisdiction of courts to include prospective grants of use immunity in the absence of the formal request that the statute requires.").

Notwithstanding this framework, Wilkerson suggests that the Court could have—and should have—immunized Ebron in one of two ways. No judge in this Circuit has ever ordered immunity under the theories that Wilkerson advances. First, Wilkerson embraces the D.C. Circuit's observation that some circuits have recognized a court's power to order immunity in "extraordinary circumstances" involving prosecutorial misconduct that distorts the judicial fact-

finding process. *Lugg*, 892 F.2d at 104 (recognizing case law outside D.C. Circuit allowing court to compel use immunity, but declining to follow under facts of case); *United States v. Perkins*, 138 F.3d 421, 424 n.2 (D.C. Cir. 1998) (same).  Unsurprisingly, Wilkerson alleges that the government distorted the fact-finding process at his trial, and argues that the Court should compel use immunity on this basis.  As discussed above, *see supra* Part III.C, the core of the allegation is this: in the years following Ebron's arrest, the government represented in other proceedings that Ebron was a helpful witness and informant.  At Wilkerson's trial, however, government attorneys discredited Ebron for purposes of Rule 804(b)(3)'s "trustworthiness" requirement.  Wilkerson claims that the government improperly changed its stated view of Ebron in an attempt to exclude the Diggs confession.

Even if Wilkerson were right that the government improperly shifted its characterization of Ebron, it would not matter in the Rule 804(b)(3) calculus.  As explained above, *see supra* Part III.C, the Court's decision to exclude the Diggs confession rests most centrally on the reliability not of Ebron's statement to the government, but of Diggs' statement to Ebron.  The critical inquiry thus concerned Diggs' background, not Ebron's.  Thus, whatever their propriety, the government's representations about Ebron's trustworthiness were ultimately immaterial.  Accordingly, the Court does not here decide whether there was any prosecutorial misconduct as to Ebron's trustworthiness, because such misconduct, even if proven, would not be practically germane and therefore would not justify the Court compelling use immunity.[11]

---

[11] As a side note, Wilkerson suggests that immunity should be compelled because the government unfairly discouraged Ebron from testifying and thereby provoked his invocation of the Fifth Amendment privilege.  This allegation is overblown.  As a starting point, Ebron invoked the Fifth Amendment after consultation with his own counsel, who naturally buffers any

(cont'd)

As a second approach, Wilkerson also argues that the Court possesses an "inherent" authority to immunize Ebron, one that exists independently of any prosecutorial misconduct. Wilkerson's extensive discussion of case law overlooks the inconvenient detail that the D.C. Circuit has rejected this theory. *See Perkins*, 138 F.3d at 424 & n.2 (denying request to recognize "inherent" authority, collecting D.C. Circuit opinions rejecting judicial authority to compel use immunity, and noting open issue whether "extraordinary circumstances" involving prosecutorial misconduct could justify compelling immunity). That precedent binds this Court.

Even were the Court not so bound, it would not be persuaded by Wilkerson's resort to a Third Circuit case in which such authority has been recognized, *Gov't of the Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir. 1980). *Virgin Islands* held that, "in order to vindicate the defendant's constitutional right to a fair trial," a court possesses inherent authority to grant immunity where "a potential defense witness can offer testimony which is clearly exculpatory and essential to a defense case." *Id.* at 974. Putting aside the fact that this Circuit has not recognized such a principle, the facts of *Virgin Islands* differ crucially from those of Wilkerson's case. In *Virgin Islands*, the witness testimony was not only exculpatory, but also *prima facie* reliable; the desired witness could identify other attackers because he admitted to participating in the attack himself. *See id.* at 966–67. In Wilkerson's case, by contrast, even if Ebron were to

---

kind of undue pressure the government might exert. Second, Wilkerson believes the government exaggerated to the Court the extent of future prosecution that Ebron was left exposed to under the terms of his plea agreement. Yet, what the government told the Court is irrelevant. The decision to invoke the Fifth Amendment was Ebron's, not the Court's. Even if Wilkerson were correct that the government gave the Court poor guidance, he does not show (or even allege) that either Ebron or Ebron's counsel shared the government's allegedly mistaken understanding. It was for Ebron alone—not Wilkerson, the government, or the Court—to weigh his potential liability if he testified, and he could review the terms of his plea agreement for himself.

27

testify, the underlying Diggs confession would itself remain unverifiable and untrustworthy

hearsay. *See supra* Part III.C. Thus, D.C. Circuit precedent precludes accepting the "inherent

authority" principle articulated in *Virgin Islands*, and that principle anyhow does not encompass

testimony as unreliable as what Wilkerson proposes. Accordingly, the Court was correct in

refusing to compel a grant of use immunity for Ebron.

### E.    Second Motion Concerning Judicial Immunity

In his Motion for a New Trial Based on Newly Discovered Evidence, Wilkerson offers a

second argument for the Court to exercise its supposed authority to immunize Ebron. Some two

years after filing the initial new trial motion concerning Ebron, defense counsel was able to

interview Ebron directly with the permission of Ebron's attorney. Ebron not only reiterated the

story of Diggs' confession, but also alleged personal knowledge of widespread government

misconduct during its prosecution of the Gray case. Wilkerson reports that, according to Ebron,

the government's witnesses were using drugs including marijuana and heroin at the jail and

frequently had new, expensive shoes when they returned from meeting with government. In

addition, Ebron claims that he saw and heard government witnesses in the Gray case

collaborating with each other to review their testimony and get their stories straight. Further,

Ebron implies that the government had some awareness of this misconduct, but did nothing to

prevent it. Some of these witnesses gave grand jury or trial testimony against Wilkerson.

According to Wilkerson, Ebron will not confirm these stories on the record without immunity.

Wilkerson's theory is that Ebron's new evidence, once put before the Court, would likely

be sufficient to prompt a new trial under *Thompson v. United States*, 188 F.2d 652 (D.C. Cir.

1951). Therefore, Wilkerson claims, the Court should immunize Ebron, hear his testimony, and

evaluate whether a new trial is warranted under *Thompson*.

It is worth repeating that the D.C. Circuit has never approved a court's authority to grant a witness use immunity where the government has not moved for it. *See supra* Part III.D. There is no good reason here to depart from that precedent. Insofar as the D.C. Circuit has left the door open to judicially compelled grants of immunity, it has done so contingent on the existence of exceptional circumstances such as prosecutorial misconduct. Presumably, as in *Virgin Islands*, the grant of immunity would be appropriate only when it would likely yield trustworthy, exculpatory, and essential testimony.

Ebron's new allegations are not nearly this compelling in their prospective impact on Wilkerson's case. Starting with the broad consideration of whether any miscarriage of justice has occurred, it must be observed that Ebron's new allegations, though concerning, do not touch on the ultimate issue of Wilkerson's guilt or innocence.

More doctrinally, too, the Ebron allegations do not hold up against well-established markers of importance. Wilkerson's premise is that the Ebron testimony, once presented, would likely satisfy the requirements for a new trial as laid forth in *Thompson*. To obtain a new trial based on newly discovered evidence under *Thompson*, Wilkerson must satisfy the following conditions:

> (1) the evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to produce the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.

*Thompson*, 188 F.2d at 653. Even assuming that immunization is proper where it is the only way to admit *Thompson*-type evidence, Wilkerson's proposal does not satisfy several elements of the

*Thompson* standard.  First, the evidence in question is precisely the type of impeachment

evidence that *Thompson* excludes from consideration.  Tales of drug use and induced or

rehearsed testimony go not directly to Wilkerson's culpability, but to the credibility of the

government's witnesses.

Second, much of the evidence is not material.  A good deal of it does not relate to

witnesses who testified against Wilkerson.  Even where it does, the evidence is largely of only

collateral importance, casting aspersions on the government's integrity in prosecuting this and

related cases.  As far as witnesses colluding to develop consistent testimony, it is left unspecified

whether any of that testimony actually entered into Wilkerson's case and on what issues.

Third, it is not clear that, in a new trial, the evidence would probably produce an

acquittal.  For one thing, Ebron's testimony (if he were granted immunity) would still be subject

to the Rules of Evidence, particularly concerning hearsay.  Many of his new allegations—in

particular any information he might have about what, if any, specific testimony against

Wilkerson was improperly manufactured through collusion of witnesses—could very well be

inadmissible.  And as stated above, none of Ebron's new allegations go directly to Wilkerson's

guilt or innocence.  Ebron's new evidence serves as nothing more than a convenient hook;

Wilkerson seeks use immunity based on it primarily because that immunity would free Ebron to

discuss the Diggs confession (itself subject to hearsay limitations), which is what touches directly

on Wilkerson's culpability.

In sum, Wilkerson's argument has three critical weaknesses: (1) it relies on accepting a

novel rule of law that the Court can grant immunity in exceptional circumstances; (2) it assumes

that such exceptional circumstances exist here; and (3) it fails to satisfy the *Thompson* standard

for granting a new trial on the grounds of newly discovered evidence. In view of these problems, the newly discovered evidence of Ebron's allegations does not warrant compelling use immunity or granting a new trial.

### IV.     Motion Alleging Prosecutorial Conduct as to Government Witness Donney Alston

In 1993, Donney Alston pled guilty to murdering Scott Downing—a murder he committed with Wilkerson and other members of the Gray organization. After initially refusing to cooperate with the government, he testified before a grand jury in 2000. He later testified against other members of the organization at a trial in 2002 and against Wilkerson at his trial in 2004. Wilkerson now reasserts previously rejected claims that the government committed improprieties in its use of Alston. Specifically, Wilkerson maintains that the government has (1) asserted inconsistent legal positions regarding the effect of incarceration on withdrawal from a conspiracy, and (2) misrepresented its knowledge about Alston's post-incarceration conduct. Wilkerson seeks a host of alternative remedies: dismissal of the indictment, a new trial, an evidentiary hearing on the government's state of knowledge regarding Alston, or disclosure by the government of all notes of its interviews with Alston.

Wilkerson argues that, in securing Alston's grand jury testimony, the government wrongfully advised Alston and argued in court that he did not have a valid Fifth Amendment privilege to assert because the statute of limitations had expired on his potential liability. The government's rationale was that Alston's arrest had created a presumption that he withdrew from the conspiracy, and since he had been arrested over five years previously, the statute of limitations on any conspiracy charges had expired. Wilkerson also alleges that by asserting in court that Alston had no Fifth Amendment privilege because he had withdrawn from the

31

conspiracy, the government made intentional factual misrepresentations because it must have

known that, post-incarceration, Alston and Wilkerson were allegedly dealing drugs in jail,

meaning that the conspiracy had continued.  Alston would later testify to that jailhouse drug

operation at Wilkerson's trial.  To Wilkerson's mind, this "grand jury abuse" by the government

prejudiced him because, had the government not misstated the law and the facts, Alston would

have asserted his Fifth Amendment privilege and not testified against Wilkerson and others.

Wilkerson elaborates on these events at length, yet never explains why he has standing to

challenge an alleged abuse of somebody else's Fifth Amendment privilege.  Moreover, he can

only speculate as to Alston's intentions; even if Alston could properly have invoked the Fifth

Amendment privilege, there is no way for Wilkerson or the Court to know whether Alston would

have actually done so or nonetheless chosen to testify.  In light of these fatal weaknesses in the

logic of Wilkerson's argument, the Court sees no need to address his allegations that the

government's factual misrepresentations were intentional, which the government hotly disputes.

Wilkerson is also irked that later in this litigation, the government argued successfully

that Wilkerson's arrest did *not* constitute his withdrawal from the conspiracy.  The consequence

was that the statute of limitations on Wilkerson's liability for the conspiracy kept running,

exposing him to charges.  Although acknowledging that the law actually states that incarceration

by itself is not an affirmative act of withdrawal and creates no presumption of withdrawal,

Wilkerson contends that, under the principle of judicial estoppel, the government should be

precluded from the benefit of that reading of the law (though it is correct) because it previously

asserted an inconsistent (and wrong) interpretation of the law as to Alston.  The Court finds not

only that Wilkerson goes too far in apprehending an intentional misdeed here by the government,

but also that it would hardly serve justice to apply to Wilkerson a legal theory that all parties and the Court recognize plainly is wrong. *See, e.g.*, *United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997) ("Although a conspirator's arrest or incarceration by itself is insufficient to constitute his withdrawal from the conspiracy, an arrest may under certain circumstances amount to a withdrawal." (internal quotation omitted)); *United States v. Harris*, 542 F.2d 1283, 1301 (7th Cir. 1976) ("The arrest or incarceration of a conspirator may constitute a withdrawal for a conspirator, but it does not as a matter of law."). From an equitable standpoint, the Court sees no reason why Wilkerson should be "compensated" for a supposed injury suffered by Alston. Accordingly, the Court will deny Wilkerson's requested relief.

### CONCLUSION

The Court finds that Wilkerson's motions are without merit. As a corollary matter, the Court is uncomfortable with the amount of resources expended in this litigation. Surely due process entitles Wilkerson to a fair opportunity to present a defense, and just as surely it is counsel's ethical duty to represent Wilkerson zealously. Particularly where the stakes are this high—Wilkerson was charged with counts related to four murders and originally this was a death penalty-eligible case—an extensive and costly defense is warranted. Here, it verges on understatement to say that no stone has been left unturned. This defense has become not so much thorough as all-consuming. The resulting burden on the public purse and the Court is difficult to justify.

An order accompanies this Memorandum Opinion.

September 18, 2009

Thomas F. Hogan
U.S. District Judge

33